PHILLIP A. TALBERT
Acting United States Attorney
PAUL A. HEMESATH
JARED C. DOLAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

FILED

AUG 9 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>   v.<br><br>MICHAEL LLAMAS,<br><br>          Defendant. | CASE NO. 2:12-cr-315 JAM<br><br>PLEA AGREEMENT |

### I.   INTRODUCTION

**A.   Scope of Agreement**

The superseding information in this case charges the defendant with a violation of 18 U.S.C. § 371 – Conspiracy to Commit Wire Fraud (Count One) and 18 U.S.C. § 4 – Misprision of a Felony (Count Two). This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case. This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

**B.   Rule 11(c)(1)(C)**

The government and the defendant agree that a specific sentence, set forth below, would be

PLEA AGREEMENT                                             1

appropriate in this case. Consequently, this plea agreement is being offered to the Court pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

Under the provisions of Rule 11(c)(3), the Court may accept or reject the plea agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider the presentence report. If the Court accepts the plea agreement, the Court will inform the defendant that it will embody in the judgment and sentence the disposition provided for in this plea agreement. If the Court rejects this plea agreement, the Court shall so advise the defendant, allow the defendant the opportunity to withdraw his pleas, and advise him that if he persists in a guilty plea the disposition of the case may be less favorable to him than is contemplated by this plea agreement.

## II. DEFENDANT'S OBLIGATIONS

### A. Guilty Plea

The defendant will plead guilty to Count One, Conspiracy to Commit Wire Fraud in violation of Title 18, United States Code, Section 371 and Count Two, Misprision of a Felony in violation of Title 18, United States Code, Section 4. The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

1. Waiver of Indictment:

The defendant acknowledges that under the United States Constitution he is entitled to be indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed.R.Crim.P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of indictment to the charges

PLEA AGREEMENT                                2

set forth in the information. The defendant agrees that at a time set by the Court, he will sign a written waiver of prosecution by Indictment and consent to proceed by Information rather than by Indictment.

    2.    Package Agreement:

The defendant acknowledges and understands that the plea offer made to him here by the government is a "package offer." That is, the defendant understands that the offer made to him is conditioned on co-defendant Peter Woodard pleading guilty according to the terms of his respective plea offer. The defendant understands that if this co-defendant declines, refuses or fails to plead guilty according to his/her respective offer, then, at the option of the government, the defendant will not be allowed to enter a plea of guilty to the offer made to him by the government. Additionally, if co-defendant Peter Woodard fails or refuses to enter his or her plea according to his or her respective offer and the defendant has already entered his plea, then this plea agreement is voidable at the option of the government. In its sole discretion, the government has the ability to withdraw from the plea agreement with the defendant and pursue the original charges as to this defendant. However, the defendant's waiver of his rights under Rule 11(f) and Fed. R. Evid. 410, as set forth in Section II.A herein, will not operate.

Recognizing that this is a package offer, the defendant confirms that he has not been threatened, pressured, or coerced by any other person, including the co-defendant, to enter into this plea agreement. The defendant also confirms that he enters into this plea agreement voluntarily because he is in fact guilty of the offense(s) to which he is pleading guilty.

**B.** **Restitution**

The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses. Defendant agrees that his conduct is governed by the Mandatory Restitution Act pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims affected by this offense, including, but not limited to, the victims covered in the factual basis, victims covered in those counts to be dismissed as part of the plea agreement pursuant to 18 U.S.C. § 3663A(a)(3), and other victims as a result of the defendant's conduct for the time period charged in the superseding information. The amount of restitution will be between $1.8 million and $25 million, subject to proof at a restitution hearing.

### C. Fine

The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a fine, and that no fine should be imposed. The defendant understands that it is his burden to affirmatively prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury to the Probation Officer and the government in advance of the issuance of the draft Presentence Investigation Report, along with supporting documentation. The government retains the right to oppose the waiver of a fine. If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered by the Court, up to the statutory maximum fine for the defendant's offense.

### D. Special Assessment

The defendant agrees to pay a special assessment of $200 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing. The defendant understands that this plea agreement is voidable at the option of the government if he fails to pay the assessment prior to that hearing. If the defendant is unable to pay the special assessment at the time of sentencing, he agrees to earn the money to pay the assessment, if necessary by participating in the Inmate Financial Responsibility Program.

### E. Violation of Plea Agreement by Defendant/Withdrawal of Plea(s)

If the defendant violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government. If the government elects not to void the agreement based on the defendant's violation, the government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. A defendant violates the plea agreement by committing any crime or providing or procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct constituting obstruction of justice. Varying from stipulated Guidelines application or agreements regarding arguments as to 18 United States Code section 3553, as set forth in this agreement, personally or through counsel, also constitutes a violation of the plea agreement. The government also shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would

otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement. The determination of whether the defendant has violated the plea agreement will be under a probable cause standard.

In addition, (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

F.  **Asset Disclosure**

The defendant agrees to make a full and complete disclosure of his assets and financial condition, and will complete the United States Attorney's Office's "Authorization to Release Information" and "Financial Affidavit" within five weeks from the entry of the defendant's change of plea, including supporting documentation. The defendant also agrees to have the Court enter an order to that effect. The defendant understands that if he fails to complete truthfully and provide the described documentation to the United States Attorney's office within the allotted time, he will be considered in

violation of the agreement, and the government shall be entitled to the remedies set forth in section II.E above.

### III. THE GOVERNMENT'S OBLIGATIONS

#### A. Dismissals

The government agrees to move, at the time of sentencing, to dismiss without prejudice the pending indictment. The government also agrees not to reinstate any dismissed count except if this agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of Plea, VI.B (Stipulations Affecting Guideline Calculation), and VII.B (Waiver of Appeal and Collateral Attack) herein.

#### B. Recommendations

1. Incarceration Range.

The government will recommend that the defendant be sentenced to the low end of the applicable guideline range as determined by the Court.

2. Acceptance of Responsibility.

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of his offense level if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G. § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

#### C. Use of Information for Sentencing

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

### IV. ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offenses to which the defendant is pleading guilty:

**As to Count One (Conspiracy to Commit Wire Fraud), the government would prove:**

(1) beginning in or about November 2007, and continuing to and including approximately in or about August 2008, in the State and Eastern District of California and elsewhere, there was an agreement between two or more persons to commit an offense against the United States, to wit: wire fraud, in violation of 18 U.S.C. § 1343;

(2) the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

(3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with the jury agreeing on a particular overt act.

The elements of wire fraud are:

(1) the defendant knowingly participated in:

    (A) a scheme and artifice to defraud, or

    (B) in a plan for obtaining money or property by making false promises or statements;

(2) the defendant knew that the scheme was misleading or that the promises or statements were false;

(3) the scheme, and/or the promises or statements, were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

(4) the defendant acted with the intent to defraud; and

(5) the defendant used, or caused to be used, wire, radio, or television communication in interstate or foreign commerce in furtherance of the scheme.

**As to Count Two (misprision of a felony), the government would prove:**

(1) the principal committed and completed the felony alleged (here, wire fraud);

(2) the defendant had full knowledge of that fact;

(3) the defendant failed to notify the authorities; and

1  (4) the defendant took an affirmative step to conceal the crime.

The defendant fully understands the nature and elements of the crimes charged in the superseding information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V.     MAXIMUM SENTENCE

### A.     Maximum Penalty

The maximum sentence that the Court can impose as to Count One is five years of incarceration, a fine of $250,000, a three-year period of supervised release and a special assessment of $100. The maximum sentence that the Court can impose as to Count Two is three years of incarceration, a fine of $250,000, a three-year period of supervised release and a special assessment of $100. By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B.     Violations of Supervised Release.

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to two additional years of imprisonment.

## VI.     SENTENCING DETERMINATION

### A.     Statutory Authority

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists

an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

### B. Stipulations Affecting Guideline Calculation

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

1. Base Offense Level: The base offense level is 6, under U.S.S.G. 2B1.1(a)(1).

2. Loss Amount: The loss figure foreseeable to defendant Llamas is greater than $3.5 million but less than $9.5 million, which adds 18 points under 2B1.1(b)(1)(K), 1b1.3

3. Victim-related Adjustments: The offense involved 10 or more victims, which adds 2 points under 2B1.1(b)(2)(A).

4. Role in the Offense Adjustment: Based on Llamas's supervisory role in the offense, 3 points are added.

5. Acceptance of Responsibility: See paragraph III.B.2 above

6. Criminal History: The parties estimate, but do not stipulate, that the defendant's criminal history category will be I.

7. Departures or Other Enhancements or Reductions:

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, except that the government may move for a departure or an adjustment based on any post-plea obstruction of justice (§3C1.1). The defendant is free to recommend to the Court whatever sentence he believes is appropriate under 18 U.S.C. § 3553(a). In opposing any request for a variance from the advisory guidelines range, the government may make any and all arguments in supports of its recommendation for a sentence at the low-end of that range.

### C. Specific Sentence Agreement

The parties agree that the sentence in this case will not exceed six years. Both the government and the defendant are free to recommend any sentence equal to, or less than, six years.

PLEA AGREEMENT 9

## VII. WAIVERS

### A. Waiver of Constitutional Rights

The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on his behalf; (e) to confront and cross-examine witnesses against him; and (f) not to be compelled to incriminate himself.

### B. Waiver of Appeal and Collateral Attack

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence. The defendant agrees as part of his plea, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case, except as set forth in this subsection. The defendant specifically gives up the right to appeal any order of restitution the Court may impose, unless the restitution ordered exceeds $25,000,000, in which case defendant shall have the right to appeal the amount of restitution only.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E herein.

### C. Waiver of Attorneys' Fees and Costs

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

PLEA AGREEMENT                               10

119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).

## VIII. ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX. APPROVALS AND SIGNATURES

### A. Defense Counsel

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: 8/5/16

MICHAEL PANCER
Attorney for Defendant

### B. Defendant:

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: 8/8/16

MICHAEL LLAMAS
Defendant

C. **Attorney for United States:**

I accept and agree to this plea agreement on behalf of the government.

Dated: 8/9/16

PHILLIP A. TALBERT
Acting United States Attorney

PAUL A. HEMESATH
Assistant United States Attorney

PLEA AGREEMENT 12

# EXHIBIT "A"

## Factual Basis for Plea(s)

### I. BACKGROUND

At all relevant times, defendant Peter Woodard was a partner with Michael Llamas in two California limited liability companies doing business in Tracy, California: (1) LW Premier Holdings, LLC "LWPH") and (2) Cobalt One, LLC ("Cobalt"). Using these entities, Llamas and Woodard approached multiple builders of new homes located in California, Arizona, Florida, and Colorado, and offered to buy unsold homes, including entire subdivisions, at discounts ranging from 30% to 50% off of the listed price of the homes. They did so using an "option contract" with the builder. In a schedule or attachment to the option contract, it listed an "option price" and a "list price" for each home.

Woodard and Llamas did not intend to purchase the properties in bulk themselves. Rather, they needed buyers to whom they could assign the right to purchase the properties. In 2007, Woodard and Llamas met Lee Loomis. Loomis managed a company called Loomis Wealth Solutions ("LWS"). LWS was a wealth management company focused on real estate investment. Loomis had convinced a large number of LWS members to purchase properties through the LWS program. Therefore, Loomis—through LWS—was able to provide a number of investors willing to buy properties. Upon purchase, Woodard and Llamas would receive and split (with Loomis) the difference between the home's "list price" (the amount portrayed as the sale price) and the reduced "option price" (the amount actually tendered to the builder), minus the down payment, as an "assignment fee."

The LWS investors used their own credit to apply for loans to buy these properties. Loomis promised investors that: (1) the properties were worth far more than their purchase price, (2) they would not have to put up a down payment, (3) LWS would contract with a third party to manage and rent out the properties, and (4) investors would receive a more than $300 monthly as an "assurance payment" for every property they bought through LWS. As a result, some investors bought multiple properties in this fashion; some only bought one. At least one investor bought eight. LWS members bought these properties based on their trust in Loomis, and they rarely even saw the properties before buying them.

Llamas and Woodard had large numbers of properties available for purchase; Loomis had convinced dozens of investors to purchase these properties. Joseph Gekko—the settlement agent who

1 | managed the escrow company Lender Services Direct—had the means to direct the documents and
2 | money necessary to finance the properties.

### Lenders were not aware of option arrangement and the "assignment fees"

Llamas, Woodard, Loomis, and Gekko became aware that lenders would not issue loans for an amount that included the assignment fee (the difference between the list price and the option price). As a result, the assignment-fee payment to LWPH and/or Cobalt was either omitted from the estimated HUD-1 settlement statements or false listed as a second-lien payoff (further described below). After underwriting approval and the close of escrow, the final HUD-1 would then be updated to include the "assignment fee" disguised as a second lien. Llamas and Woodard were fully aware of undisclosed assignment fees on the estimated HUD-1 documents. They knew that, had lenders become aware of the assignment fee, they would not have issued the loans.

In the beginning of 2008, to ensure the lenders would approve loans consistent with option payment, Llamas, Woodard and Gekko caused second-position liens to be filed in county recorders' offices purporting to show that Llamas and Woodard held a secured interest in the homes. The liens falsely show that Cobalt (one of the two companies controlled by Llamas and Woodard) loaned money to a builder and that the loan was secured by the properties. In effect, the liens made it appear that the assignment fee paid to Cobalt and/or LWPH was a legitimate construction loan payoff. This act was necessary to explain the payments on the final HUD-1 documents. At all times, Llamas and Woodard were aware that they had not loaned the builder money for construction purposes.

### Lenders were not aware of the source (or the lack of) down payments on mortgage loans

Mortgage lenders typically expected to see down payments of approximately 20% (or more) of the reported sales price on each investment property a LWS member purchased from home builders. As previously stated, LWS members were induced to purchase these homes, in part, based on Loomis's representation that members would not have to make the down payments. Loomis used an investment fund he controlled named Naras Secured Funds II ("Naras") to make the down payments. In order to satisfy lenders' requirement for the 20% down payment from the purchaser, Gekko released lenders' funds (which were well in excess of the payoff to the home builder at closing) and did not negotiate the down payments checks until after closing, thus allowing the loan proceeds to fund accounts from which

down payment checks were being drawn. Lenders were not aware that the loan proceeds were being used to fund the 20% down payment. In other words, the down payments were illusory. At all times, Llamas and Woodard were aware that, had the lender known that loan proceeds were funding the down payment, they would not have issued the loans.

## II. OVERT ACTS: BAKERSFIELD

In or around October 2007, following several months of negotiations, a new home builder located in Bakersfield, California, agreed to sell homes in bulk to Llamas and Woodard via a series of option contracts signed by Woodard for 30% off of the listed price. Llamas and Woodard met in person with the builder in Llamas and Woodard's offices in Tracy, California. Llamas explained that Loomis could purchase hundreds of homes from the builder with his nominees.

In approximately December 2007, Llamas contacted an employee of the builder and explained that lenders would not fund loans for their buyers with a thirty percent fee going to LW Premier or Cobalt One. Llamas told the employee that they had taken the loan packages to Countrywide Home Loans and that Countrywide would agree to consider funding loans where a commission was paid to a real estate agent of up to nine percent, but they would not agree to fund any loans where a 30 percent commission was paid. In that and subsequent conversations with Llamas, Llamas asked the builder to record a false Deed of Trust for the amount of the fees in an effort to deceive other lenders into believing that a second lien existed and was the reason for such a payment on the HUD-1 Settlement Statements.

The builder agreed to Llamas's request, but wanted a full reconveyance prepared in advance for all the properties before filing the false deeds of trust encumbering the properties. Based on the foregoing, on January 2 and 11, 2008, respectively, blanket deeds of trust in the amounts of $1,260,000 and $2,097,288, covering every anticipated transaction under the option contracts were filed as official records at the Kern County Recorder's Office. Altogether, beginning in or about October 2007 and continuing through at least in or about February 2008, 21 properties in Bakersfield were sold under the option contract scheme to LWS members, causing lenders to lose approximately $1,800,000 due to short sales and foreclosures. Each transaction caused the Kern County Recorder's Office to mail a false lien from Bakersfield to LSD in Mission Viejo, to justify the payoff to Cobalt One. Moreover, deeds of trust evidencing the lender's legitimate lien were also mailed routinely from the Kern County Recorder's

Office as part of the real estate closing process.  Woodard and others also caused interstate wires to be sent from Cobalt's Bank of America account to LWS's and Naras's Washington Mutual bank accounts, which wire transfers cleared via the Fedwire system.

These wire amounts consisted of refunded down payments and a share of the option fee on the Bakersfield properties. With respect solely to the Bakersfield properties, LWPH/Cobalt wired approximately $251,000 in profits to LWS after keeping the same amount for itself.

### III. RELEVANT CONDUCT

The co-conspirators are responsible for similar illegal activity in several additional building developments located in California and several other states. The Bakersfield scheme alone averages a loss to the lenders of over $80,000 per property. The profit split between LWS and Cobalt One/LWPH exceeds $3,500,000 for the approximately 220 properties identified.

Dated: 8/8/16

MICHAEL LLAMAS
Defendant